# United States District Court
### for the
# Eastern District of Washington

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

## Jul 20, 2020

SEAN F. McAVOY, CLERK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No.  2:20-mj-00275-JTR** |
| | ) | |
| | ) | |
| **MICHAEL THOMAS MATTERN,** | ) | |
| *Defendant.* | ) | |

## CRIMINAL COMPLAINT

I, Special Agent David DiBartolo, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date(s) July 19, 2020, in the county of Spokane in the Eastern District of Washington, the defendant, Michael Thomas Mattern, violated: 21 United States Code, Sections, 841(a)(1), (b)(1)(A)(viii).

This complaint is based on these facts:

☒Continued on the attached sheet.

_____
*Complainant's signature*

*Special Agent David DiBartolo, FBI*

*Printed name and title*

☐ Sworn to before me and signed in my presence.
☒ Sworn to telephonically and signed electronically.

Date: ___7-20-2020___

_____
*Judge's signature*

*Johns T. Rodgers, United States Magistrate Judge*

*Printed name and title*

City and state: <u>Spokane , Washington</u>



County: Spokane

*In Re: Affidavit in Support of a Criminal Complaint Charging Michael Thomas Mattern (DOB 08/01/1974) with Possession of Five Grams or More of Pure Methamphetamine With Intent to Distribute, in Violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii)*

## AFFIDAVIT

State of Washington )
) :ss
County of Spokane )

I, David DiBartolo, being first duly sworn, hereby depose and state as follows:

## <u>INTRODUCTION</u>

1.      I make this Affidavit in support of a criminal complaint charging Michael Thomas Mattern ("MATTERN"), whose date of birth is August 1, 1974, whose Social Security Number ends in 2307, and who resides at 8524 E Mission Ave, Spokane Valley, Washington, 99212 ("MATTERN") with possession of five grams or more of pure methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii), within the Eastern District of Washington.

2.      Based on numerous intercepted jail calls, surveillance, and the execution of a search warrant for MATTERN's person and personal effects, I submit that there is probable cause to believe that on or about July 20, 2020, MATTERN knowingly possessed approximately fifteen grams of pure

methamphetamine (including packaging) inside the Airway Heights Corrections Center ("AHCC"), his place of employment, in the Eastern District of Washington, that he did so with the intent to distribute the methamphetamine to Joseph BURNETT and/or others who are inmates at AHCC.

## AFFIANT TRAINING AND EXPERIENCE

3.　　I have been a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") since 2010 and am currently assigned to the Seattle, Washington FBI field office, specifically to the Spokane, Washington Resident Agency. I have maintained a Certified Public Accounting ("CPA") license since November 2007. I have received training through the FBI pertaining to email communications, computers, cloud computing, and cellular telephones. In August 2019, I obtained the Global Information Assurance Certification ("GIAC") Security Essentials ("GSEC") certification. One of my responsibilities is the investigation of federal criminal law related to corruption of public officials. As an FBI SA, I have previously been the case agent on at least one investigation that resulted in the successful prosecution of a public official. From January 2011 through February 2016, I was assigned to the Tri-Cities Resident Agency in Richland, Washington, and regularly participated in narcotics investigations with the Eastern Washington Safe Streets Violent Gang Task Force – Tri-Cities.

4.     In the course of this investigation, I have worked closely with several other law enforcement officers, including the following law enforcement officers, and I have relied on statements that they have made to me orally and/or in writing, as set forth herein:

a.     FBI SA Marilyn Shefveland has been an SA for twenty years and is currently assigned to the Spokane, Washington, Resident Agency.  SA Shefveland has worked a variety of federal criminal violations including cases related to public corruption.  She has completed specialized criminal investigative training including training specific to white collar crime, money laundering, and public corruption.  SA Shefveland provided me with the foregoing information regarding her training and experience.

b.     Joshua M. Greene has been employed by the Washington State Department of Corrections ("DOC") for approximately 14 years.  Greene's current role is an Investigator 2 with the Airway Heights Corrections Center ("AHCC") Intelligence and Investigations Unit ("IIU"), which he has held for the last eight years.  Investigator Greene has training in the following: narcotics detection and identification through the Washington State Patrol; telephone monitoring and surveillance training through Global Tel Link; Reid interview and interrogation basic and advanced training, crime scene investigation training with the Washington Homicide Investigators Association; security threat group training

with the Northwest Gang Investigators Association; crime scene processing and evidence preservation with the Spokane County Forensic Unit; and open source media training with the FBI. Investigator Greene has worked multiple cases with local and federal law enforcement agencies including the Airway Heights Police Department, United States Postal Inspection Service, Spokane County Sheriff's Department, and FBI. These cases have included investigations of introduction of contraband into a secure facility, trafficking of narcotics, and compromised staff members that work for the Washington State DOC. Through Investigator Greene's training and experience, he has become familiar with prison culture, gang sub-culture, and drug and money laundering sub-culture, including knowledge of controlled substance trafficking violations. Investigator Greene provided me with the foregoing information regarding his training and experience.

        c.     Joshua Largent has been employed by the Washington State DOC for approximately 18 years. Investigator Largent's current role is an Investigator 2 with the AHCC IIU which he has held for the last year-and-a-half. Investigator Largent obtained a degree in Corrections from Spokane Community College. He also graduated from the Correctional Officer Academy and Emergency Response Team Academy. Investigator Largent has training in the following: narcotics detection and identification through Washington State Patrol; telephone monitoring and surveillance training through Global Tel Link;

workplace investigator training; and security threat group training with the Northwest Gang Investigators Association. Investigator Largent has worked cases with local and federal Law Enforcement Agencies including the Airway Heights Police Department and United States Postal Inspector Service. These cases included investigations of the introduction of contraband into a secure facility, trafficking of narcotics, and compromised staff members that work for the Washington State DOC. Through Investigator Largent's training and experience, he has become familiar with prison culture, gang sub-culture, and drug and money laundering sub-culture, including knowledge of controlled substance trafficking violations. Investigator Largent provided me with the foregoing information regarding his training and experience.

5.     The information in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses, as set forth herein. This Affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not set forth all of my knowledge about this matter.

6.     I submit that there is probable cause to believe that MATTERN has smuggled Suboxone, heroin, and methamphetamine into the AHCC, a correctional facility that houses federal prisoners in the Eastern District of Washington. I also submit that there is probable cause to believe that MATTERN and his

coconspirators use cellular telephones to communicate with one another about the scheme, including quantities, prices, and availability of drugs, and to set up deliveries and pickups of drugs.

7.     I further submit that there is probable cause to believe that MATTERN drives a gold-colored 2005 Nissan Altima, to pick drugs up from one of his sources of supply, Brandy Elice Lorentzen ("LORENTZEN"). I submit that there is probable cause to believe that MATTERN knowingly delivers drugs into the correctional facility, to which he has access by virtue of being a correctional officer there, on his person or in his personal effects, and thereafter knowingly distributes the drugs to BURNETT and/or other inmates in the facility.

## STATEMENT OF PROBABLE CAUSE

### *CORRUPTION AT AHCC*

8.     AHCC is a Washington State Department of Corrections ("DOC") medium-security state prison facility located in Airway Heights, Washington, within the Eastern District of Washington. I know from my training and experience, and from consulting with AHCC personnel during this investigation that AHCC generally houses federal inmates and is currently housing federal inmates – that is, persons who are being held in custody by direction of or pursuant to a contract or agreement with the Attorney General.

9.     Multiple criminal informants ("CIs") who are inmates at AHCC have informed AHCC IIU investigators that a corrections officer in "R" Unit is bringing Suboxone and other contraband into the facility.  Some of these inmates have specifically identified MATTERN as the corrections officer who is bringing contraband into the facility.  Based on these allegations, AHCC IIU initiated an investigation into MATTERN, which has led to evidence that MATTERN has been compromised as a corrections officer and is introducing controlled substances into AHCC's secure facility in exchange for money, drugs, and sex.

10.     During the course of this investigation, I have learned that due to the COVID-19 pandemic, Washington State DOC temporarily suspended general visitation to all correctional facilities, including extended family visits, effective March 13, 2020.  In addition, all volunteer access and associated services have been suspended at all prison facilities effective March 20, 2020.  As a result of these temporary suspensions of access, it is not possible for family members or other guests to bring contraband into the facility.  Thus, at this time the only practicable means for inmates to obtain contraband from outside the facility, including controlled substances, is through DOC employees, including correctional officers such as MATTERN.

*SUBOXONE*

11.     I know from my training and experience, including consultation with the SUBOXONE® website, that Suboxone sublingual film is a schedule-III controlled substance prescription medicine used to treat adults who are addicted to opioid drugs as part of a complete treatment program that also includes counseling and behavioral therapy.  Suboxone contains buprenorphine, which can be a target for people who abuse prescription medicines or street drugs, and it can cause death or harm.

12.     I know from my training and experience, including consultation with the website www.drugs.com that Suboxone (buprenorphine and naloxone) sublingual film is often an orange film, imprinted with a logo identifying the product and strength in white ink.  I know that the size of a strip of Suboxone is smaller than an adult human finger.

*COCONSPIRATORS*

13.     From my training and experience, my investigation in this case, my conversations with AHCC staff, surveillance, and consultation with open-source, DMV, DOL, and criminal history databases, I know the following about the suspected coconspirators in this investigation.

        a.      MATTERN is a correctional officer at AHCC and has held this position since August of 2000.  MATTERN is primarily assigned to the "R" Unit

within AHCC. I know from the Accurint law enforcement database that MATTERN resides at 8524 East Mission Avenue, Spokane Valley, Washington, 99212. With other law enforcement personnel, I conducted surveillance on a number of dates, including June 26, 2020, June 27, 2020, July 8, 2020, and July 18, 2020, and I saw MATTERN and a gold Nissan Altima bearing Washington license plate BSR5678, at this residence. DMV records indicate that MATTERN is the registered owner of the Nissan. MATTERN was arrested in January 2016 for domestic violence. According to AHCC staff, MATTERN is currently divorced and lives alone.

b.     Joseph Owen BURNETT ("BURNETT") is currently an inmate at AHCC who lives in the "R" Unit of the facility. BURNETT is currently serving a sentence for theft and robbery. BURNETT has multiple additional felony convictions including residential burglary, theft and forgery. As recently as February 2017, BURNETT was arrested for possession of a controlled substance without a prescription by the Spokane County Sheriff's Office.

c.     LORENTZEN resides at 1919 East Mission Avenue, Spokane, Washington, 99202, based on records from the Washington Department of Licensing and surveillance that I conducted at her residence on June 27, 2020. I know from the publicly-available records of this Court that LORENTZEN has a 2008 conviction in this Court for possession with intent to distribute 100 or more

grams of a mixture or substance containing a detectable amount of heroin, in case number 2:08-CR-00082-WFN, for which she was sentenced to 70 months and four years of Supervised Release. It appears that she was accepted into this Court's STEP program, but that she violated the terms of her supervision in 2017, and was sentenced to 14 months of additional incarceration by the Hon. Wm. Fremming Nielsen, Senior United States District Judge. According to her judgment documents, it appears that LORENTZEN's violations included testing positive for methamphetamine; commission of another federal, state or local crime; possession of an illegal controlled substance (heroin); use of an illegal controlled substance (heroin); frequenting places where controlled substances are used, sold or distributed; associating with known felons; and absconding from supervision.

   d.  Michael James Runge ("RUNGE") who was previously incarcerated at AHCC, was released on January 21, 2020, and is currently on DOC supervision until January 20, 2021. RUNGE resides at 528 West 27th Avenue, Spokane, Washington, according to Washington State Department of Licensing records. RUNGE has been convicted of a dozen felonies dating back to 1996 and as recent as 2018. His most recent felony convictions from 2018 include possession of a controlled substance without a prescription.

*REVIEW OF PRISON CALLS*

14.     AHCC IIU Investigators Greene and Largent have reviewed numerous recorded telephone calls made from the AHCC facility by BURNETT to associates outside the facility, including LORENTZEN and RUNGE; they have provided me with summaries and partial transcriptions of these calls, which I have reviewed.  In addition, the FBI has obtained the actual recordings of these calls directly from Washington State DOC. Investigators Greene and Largent have identified multiple calls by BURNETT containing conversations about controlled substances and transactions with a person referred to in coded language as "Goldy" or "Gold Car guy."   Based on the context of the calls, the fact that MATTERN drives a gold 2005 Nissan Altima, and the fact that MATTERN has been surveilled meeting LORENTZEN in the Nissan Altima at times that correspond to information in the recorded jail calls, I submit that MATTERN is the person referred to in the calls as "Goldy" or "Gold Car Guy."   Based on the context and language used in the calls, and the training, knowledge, and experience of Investigators Greene and Largent and SA Shefveland and myself, I submit that BURNETT and his associates discuss Suboxone, methamphetamine and heroin in coded language.

15.     I know from my training and experience that it is common for incarcerated individuals to use the Personal Identifying Numbers, or "PINs" that are assigned to other inmates to make telephone calls when conducting criminal

activity, in order to disguise their true identities and evade detection by the facility and/or other law enforcement officers. In this investigation, AHCC IIU Investigators Greene and Largent were able to identify the callers and called parties as set forth herein, through multiple means including: the PINs identified and/or used during the calls, hours of listening and reviewing calls to determine speakers by voice recognition, and parties identifying themselves on the calls by providing personal information including names and locations. Based on this information, which I learned from Investigators Greene and Largent, I submit that the identities of the callers I set forth in this Affidavit are accurate. The transcriptions of these calls is not necessarily word-perfect or verbatim, and is subject to the quality of the calls, the volume of the speakers, and the transcriber's ability to interpret context.

*LORENTZEN'S USE OF (509) 866-1433*

16. "JPay" is a privately held corrections-related service provider which provides services to inmates, allowing them to transfer money and send/receive email messages with people who are not in custody. JPay's services are used at AHCC.

17. The customer information and account summary for the "Brandy E. Lorentzen" JPay account was provided to me by AHCC IIU. The email associated with the account is "Breezy2975@gmail.com". I obtained records from Google

for the email account Breezy2975@gmail.com. The recovery SMS telephone number is (509) 866-1433, consistent with calls identified herein that are made to or from LORENTZEN.

18.     In addition, the most recent IP address in the records used to login to this account was 98.203.194.190, on July 5, 2020. The JPay account for user "Brandy E. Lorentzen" has sent multiple JPay email messages to BURNETT in 2020. The IP address used to send at least nine messages since April 13, 2020, was 98.203.194.190, the same IP address as the most recent login for "Breezy2975@gmail.com."

19.     Accordingly, I submit that there is probable cause to believe that the person using (509) 866-1433 is in fact LORENTZEN.

### PRISON CALLS IN FURTHERANCE OF THE CONSPIRACY

20.     On March 21, 2020 at approximately 6:04PM, a call was placed by BURNETT from his account to (509) 866-1433. AHCC IIU reviewed this call and determined the call was placed by BURNETT and the conversation was with LORENTZEN. A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

> BURNETT: I'm trying to get that sent to you right now. I just talked to him right now.
>
> LORENTZEN: Okay, how much?
>
> BURNETT: It should be 150. Her name is Cindy.

> LORENTZEN:  Okay, just make sure to put it under the name of Powell instead of Lorentzen.

21.     On March 28, 2020 at approximately 2:42PM, a call was placed by BURNETT from another inmate's account to (509) 228-2373.  AHCC IIU reviewed this call and determined the call was placed by BURNETT and the conversation was with RUNGE.  A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

> BURNETT:  What would it take to get 10 of those?  I'm telling you right now, this is something that I think you can put together in your own head, but, I've been working on this for awhile with somebody and this is something that be very, very big and very, very happy for both of us.

> RUNGE:  I haven't been taking them anymore and I still got a few of them.  You can have the ones I got and I am going to go on Monday and get stripped again.  I can have them Monday no problem.

> BURNETT:  I need to get them to Brandy so he can pick them up the next day.  I'm telling you right now, straight up, they are 250 bucks a piece right now and I promise you, I have the only way right now.

> RUNGE:  If I can have a little piece of the pie, I got you.  I can get as many as I can.

> BURNETT:  I promise you. I'll make it worth your while.  I am going to give you Brandy's number.  If you round up 10 by tomorrow it would be even better.  It's 509-866-1433.

Based on my knowledge, experience, review of call summaries and consulting with AHCC IIU Investigators who reviewed this call, I believe that this conversation is

about BURNETT requesting RUNGE to obtain SUBOXONE strips which

BURNETT intends to sell within AHCC after they are delivered by MATTERN.

22.     On March 29, 2020, at approximately 9:14AM, a call was placed by

BURNETT from another inmate's account to telephone number (509) 866-1433.

AHCC IIU reviewed this call and determined that call was placed by BURNETT

and the conversation was with LORENTZEN.  A portion of the call AHCC IIU

Investigators reviewed is transcribed as follows:

> BURNETT:  I called you last night on a different number, you know
> where you are getting those subs?
>
> LORENTZEN:  Not right off hand.
>
> BURNETT:  My second question is, that my boy Mike just got out,
> and he gets them tomorrow, and if there is any way possible, and
> believe me I would never ask you to meet somebody I don't trust, and
> that I am close to, if you can meet him, and I can give him your
> number when I talk to him later and then you can give them to
> somebody to bring to me. I can make sure you are taken care of.
>
> LORENTZEN:  Yeah
>
> BURNETT:  I just wanted to make sure it is alright with you.
>
> LORENTZEN:  Yeah, it's fine.
>
> BURNETT:  Alright well I'll talk to him and I'll give him your
> number.  He says tomorrow he goes down at 4 o'clock and then he
> will get them and drop them off and I will have my other buddy pick
> them up.
>
> LORENTZEN:  Just let me know what I have to do and where I have
> to go and all that shit.

Based on my knowledge and experience and consulting with Investigators Greene and Largent, I believe that BURNETT is referring in this call to Suboxone when he asks, "where you getting those subs?" I believe BURNETT is referring to RUNGE when he says, "my boy Mike" because BURNETT called RUNGE the day before, RUNGE's first name is Michael, and RUNGE was released approximately two months before this call.

23.     On April 1, 2020, at approximately 9:50AM, a call was placed by BURNETT from his account to (509) 866-1433.  AHCC IIU reviewed this call and determined the call was placed by BURNETT and the conversation was with LORENTZEN.  A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

> BURNETT:  Those motherfucking faggots text you back?
>
> LORENTZEN:  I'm supposed to meet one of them.
>
> BURNETT:  Which one?
>
> LORENTZEN:  The one on 27th.
>
> BURNETT:  You're a bad ass. I really appreciate you. This door was about to close, this was my last swing. Will you text the number that is supposed to pick them up and let him know, please, it is really, really important to me.

Based on my knowledge and experience, review of BURNETT's calls, consulting with Investigators Greene and Largent and the timing of this call, I believe

BURNETT and LORENTZEN were discussing picking up Suboxone from

RUNGE.  The current address for RUNGE is on West 27th Avenue in Spokane.

24.    On April 1, 2020, at approximately 12:09PM, a call was placed by

BURNETT from his account to (509) 866-1433.  AHCC IIU reviewed this call and

determined the call was placed by BURNETT and the conversation was with

LORENTZEN.  A portion of the call AHCC IIU Investigators reviewed is

transcribed as follows:

> BURNETT:  Can you send him a text and that you will figure it out
> and that you will send him a text as soon as you can meet him and hey
> . . . .  I talked to him and he said he wanted something but I don't
> know what it is because obviously in here it is hard to communicate
> but I told him to tell you so you can tell me. I told him I don't care
> what it is, if it's a hooker, it is whatever I told him to tell you. He is a
> G, he is with it, I promise.
>
> LORENTZEN: Okay.

Based on my knowledge and experience, review of BURNETT's calls, consulting

with Investigators Greene and Largent, the timing of this call, and the context,

which indicates that BURNETT has spoken in person to someone who wants

something in exchange for what appears to be delivering contraband, I believe

BURNETT is instructing LORENTZEN to text MATTERN about meeting to pick

up Suboxone to deliver to AHCC, and to find out what MATTERN wants in

return, including potentially the services of a prostitute.

25.     On April 1, 2020, at approximately 3:28PM, a call was placed by BURNETT from his account to (509) 866-1433.  AHCC IIU reviewed this call and determined the call was placed by BURNETT and the conversation was with LORENTZEN.  A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

> LORENTZEN:  Good news, I am getting ready to go meet the dude to drop him the . . . yeah.
>
> BURNETT:  Oh really, thank you, you're a bad ass.  When you drop those off, will you let him know you will probably have more in the next couple days?
>
> LORENTZEN:  Yeah, I already told him that.
>
> BURNETT:  I told him to tell you that whatever he needs or wants or likes.  Make sure you tell him that you're Travis's friend.  Keep on that for me and Mike is trying to get other avenues right now, every time you can do it, just text him and I will keep sending you money.

Based on my knowledge and experience, review of BURNETT's calls, consulting with Investigators Greene and Largent and the timing of this call, I believe LORENTZEN is referring to MATTERN when she says she is going to "meet the dude" and is referring to giving MATTERN Suboxone when she says "drop him." I believe BURNETT is referring to Travis Franklin ("FRANKLIN") when he says "Travis."  FRANKLIN is an inmate at AHCC and works as a porter in the "R" Unit.  Surveillance video footage from the "R" Unit in AHCC shows MATTERN and FRANKLIN in a storage area that is not fully visible to surveillance cameras.

26.     On April 1, 2020, at approximately 8:21PM, a call was placed by

BURNETT from his account to (509) 866-1433.  AHCC IIU reviewed this call and

determined the call was placed by BURNETT and the conversation was with

LORENTZEN.  A portion of the call AHCC IIU Investigators reviewed is

transcribed as follows:

> LORENTZEN:  I met with that one guy out in the valley.
>
> BURNETT:  Did you drop those off?
>
> LORENTZEN:  Yeah, that is what I was just talking about.
>
> BURNETT:  If Ronnie or Mike get a hold of them again or if you can find them, I can keep sending you money to get them or whatever. They are 250 a piece right now.
>
> LORENTZEN:  Hundred?
>
> BURNETT:  Yeah, 250 apiece.
>
> LORENTZEN:  Wow.
>
> BURNETT:  I sent you a letter to that 1919, I don't know how long it is going to take to get there.

Based on my knowledge and experience, review of BURNETT's calls, consulting

with IIU Investigators Greene and Largent and the timing of this call, I believe

LORENTZEN is referring to MATTERN when she says she met with "that one

guy out in the valley," and that she delivered Suboxone to him.  I believe

BURNETT is referring to the price of a Suboxone strip when he says "250" as that

is consistent with CI reporting inside AHCC about the going rate for a strip of

Suboxone inside the facility. In addition, LORENTZEN resides at 1919 E. Mission Avenue in Spokane, consistent with BURNETT confirming that he sent her a letter to "that 1919."

27. On April 3, 2020, at approximately 5:54PM, a call was placed by BURNETT from his account to (509) 866-1433. AHCC IIU reviewed this call and determined the call was placed by BURNETT and the conversation was with LORENTZEN. A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

> BURNETT: When I call you again on my number, I am going to say Brandy first, so don't say anything crazy.
>
> LORENTZEN: What do you mean?
>
> BURNETT: Well when I call you, normally I call you on different numbers, you know what I mean, so it is not tied to me.
>
> LORENTZEN: Oh yeah, yeah, okay. Yeah, I got you, so I don't say anything retarded. Yeah, I got you.

Based on my knowledge and experience, review of BURNETT's calls, consulting with IIU Investigators Greene and Largent and the timing of this call, I believe BURNETT is discussing his practice of using other inmates' PIN numbers to make calls in an effort to hide his criminal activity and was instructing LORENTZEN not to say anything overt about their criminal conduct (statements that would be "crazy" and "retarded" to make on a phone line assigned to BURNETT) when BURNETT calls from his actual account.

28.    On April 6, 2020, at approximately 8:03PM, a call was placed from another inmate's account to (509) 866-1433.  AHCC IIU reviewed this call and determined the call was placed by BURNETT and the conversation was with LORENTZEN.  A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

> BURNETT:  Did my home girl's chick call you?
>
> LORENTZEN:  Nobody called me or texted me.
>
> BURNETT:  Okay, I did have a conversation with ol' boy, this kind of a plan, I know I am asking a lot, but uh, if there is anyway a possibility, my homeboy's old lady has a friend that I need you to introduce him to.  But you can't give his number or anything like that, she will come to you.
>
> LORENTZEN:  I can't what?
>
> BURNETT:  You can't give up his number, period.  You are the only one who gets to talk to him.  They will come meet you and you can take her and introduce her to him, and she knows what to do and uh, it will all work out and uh, she also has some of those to give to you, to give to him also.  But that is between you and him only, you know what I mean.
>
> LORENTZEN:  Yeah.
>
> BURNETT:  I will absolutely take care of you, I promise.  If it is possible that you can send him a text that you got a home girl that wants to meet him and he will know exactly what you are talking about and maybe you can line it up for tomorrow or something.  I will have you get on the phone and have this chick call you if possible.
>
> LORENTZEN:  Okay

BURNETT:  Her name is Brittany, he just talked to her; she should be calling you.  I just want to make sure you knew that the communication is between you and him, nobody gets his number, you know what I mean.

LORENTZEN:  Yeah.

BURNETT:  Maybe if you don't mind, sending him a text and say, "hey, I got a home girl that wants to meet you maybe tomorrow would work out."

LORENTZEN:  Okay.

BURNETT:  That would be awesome.  And I'll have her get ahold of you right away, if you wouldn't mind.  Make them come to you and take her and the . . .  to him.

LORENTZEN:  Okay.

BURNETT:  Will you give him a text and let him know?

LORENTZEN:  The gold car guy?

BURNETT:  Yeah, just let him know he's got a home girl that want to meet him, you know.  And then she will have more of those for ya too, but she will give them to you and you can handle all that.

Based on my knowledge and experience, review of BURNETT's calls, consulting with IIU Investigators Greene and Largent and the timing of this call, I believe BURNETT is instructing LORENTZEN to coordinate with Brittnei Fawver ("FAWVER") to get a prostitute to bring to MATTERN and to pick up Suboxone strips, of which some will be given to MATTERN for his personal use. Approximately 15 minutes before this call, AHCC inmate Caleb Loutzenhiser ("LOUTZENHISER"), living in the "R" Unit of AHCC, placed a call from his own

account to FAWVER and instructed her to find a girl that "will trick with this dude" and to call "Brandy" at "866-1433". LORENTZEN's first name is Brandy, and she uses the telephone assigned the number (509) 866-1433. I submit that "gold car guy" is code for MATTERN, based on him driving the gold Nissan Altima. I know from my training and experience that "tricking" is street slang for prostitution.

29. I believe that MATTERN has previously facilitated the distribution of methamphetamine into the AHCC. On May 6, 2020, at approximately 6:03 PM, a call was placed by BURNETT from another inmate's account to (509) 866-1433. AHCC IIU reviewed this call and determined the call was placed by BURNETT and the conversation was with LORENTZEN. A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

> BURNETT: This is what I am trying to do, you sent one of those last time. You sent me less than one with like a half on it.
>
> LORENTZEN: Oh, you are talking about your birthday card?
>
> BURNETT: Yeah, if you can get two of those and put 4 or 5 on each one and just soak the whole thing, you think it is a possibility?
>
> LORENTZEN: It is hard to get one of those birthday cards right now. I've been trying for a few days.
>
> BURNETT: Even if the one you have, if you can drench it, it doesn't matter, you know what I mean.
>
> LORENTZEN: The thing is, I'm trying to find the stuff for the birthday card, the glitter, but it is hard to find.

BURNETT:  Mike says he has some for me… can you get it if I send you the money?

LORENTZEN:  That is the thing, it is hard to locate.

BURNETT:  I have a bunch of money right now. Basically right now in the next day or two, I was trying to get him that 100 bucks and a couple cards. But I want to round up at least 30 or 40 of those so I can send you a couple grand. I don't care what it looks like, I just want enough put on it to make it worth it for us. I have to give him a bill too, the one I haven't seen you, the one who needs it.

LORENTZEN:  Are you talking about the gold car?

BURNETT:  Uh, the 100 dollars.

LORENTZEN:  Yeah, does that go to the gold car?

BURNETT:  Yeah

LORENTZEN:  Okay.

BURNETT:  If you can get him that hundred bucks… basically my whole goal is to wait on the other one, because it will be more worth it. I know you said you have that one 10 dollar money order, but I would like to get 3 or 4 more 10 dollar money orders, you know what I mean?

LORENTZEN:  Yeah, hold on, I am going to find out what he wrote down. I was partially right on the size of them. He says he has two of the big size and 16 of the half size ones.

BURNETT:  Yeah, I want them all.

LORENTZEN:  It will be me paying for him… I'll buy them tonight.

BURNETT:  I want to push the envelope this time and go for as many as we can get. The birthday card you sent me, I want you to put 4 or 5

times that on it. Would you mind sending him a text and telling him we'll have it ready for him tomorrow or the next day?

LORENTZEN: Who, gold car?

BURNETT: Yeah, yeah, yeah.

LORENTZEN: Okay, so I have to have the money and the birthday card for him.

Based on my review of call summaries and consulting with AHCC IIU Investigators who reviewed this call and others, I believe when BURNETT and LORENTZEN refer to a "birthday card" they are referring to methamphetamine paper. I know from my training and experience that it is a common technique for inmates to have associates soak greeting cards in methamphetamine and then send the cards into the correctional facilities as a means to get methamphetamine inside facilities. Additionally, I believe this because I know that BURNETT's actual birthday is not until August 7, approximately three months from the date of this call, and BURNETT specifically instructs LORENTZEN to "soak" and "drench" the card. I know that LORENTZEN would need a secure, safe location to engage in the conduct of drenching a greeting card in methamphetamine, such as her home, before delivering it to "gold car," who I believe is MATTERN.

30. On May 9, 2020, at approximately 7:24PM, a call was placed by BURNETT from his account to (509) 866-1433. AHCC IIU reviewed this call and determined the call was placed by BURNETT and the conversation was with

LORENTZEN. A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

> BURNETT: I don't know if you know Eli, but he has 40 of those strips, the orange ones. I'm trying to get ahead so I can have you just start collecting it. That way I don't have to worry about nothing and neither do you, and gold car guy is happy. Please try and round those up by tomorrow if you can. Call him tonight and say you've been super busy and you'll take care of it tomorrow.

> LORENTZEN: Who, Goldy?

> BURNETT: Yeah, save 100 for him too. If you could just text Goldy and tell him that you didn't get everything put together and tomorrow would work better, that way I can talk to him.

Based on my knowledge and experience, review of BURNETT's calls, consulting with IIU Investigators Greene and Largent and the timing of this call, I believe BURNETT is referring to Suboxone when he refers to "40 of those strips, the orange ones"; I know that Suboxone is typically produced on orange-colored strips. I believe BURNETT is further instructing LORENTZEN to get Suboxone from Eli, an unidentified conspirator, to give to MATTERN. In a subsequent call by BURNETT to "Eli", BURNETT states, "they are going for 250 bucks a piece and they are the most wanted," and "I got people that will send $1,000 right now for 4 of them. You can cut up 8 pieces and sell each piece for 40 bucks." I believe "Eli" is an additional source of Suboxone supply for BURNETT, who can divide up full strips of Suboxone and sell it within the walls of AHCC.

31.     On May 22, 2020, at approximately 11:25AM, a call was placed from another inmate's account to (509) 866-1433.  AHCC IIU reviewed this call and determined the call was placed by BURNETT and the conversation was with LORENTZEN. A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

> BURNETT:  I'm going to send you 35 and you have to give him 1 and Eli 7-8, so I need your commitment that you're all in.  Next time we need 3 and 3 of those and 80-100 of the other ones.  I'll send you enough so you can get a new phone that we can talk on.  I need to get him this 1 right away because he is our egg.  My plan is to do it once a month, but we have to make it worth it.  I just need your full commitment.  I'll make sure you have a couple grand a month.  Need to get a phone that's not connected to you.

Based on my knowledge and experience, review of BURNETT's calls, consulting with IIU Investigators Greene and Largent and the timing of this call, I believe BURNETT is discussing money and means $3,500 when he says "35", $1,000 when he says "1" and $700-$800 when he says "7-8".  I submit that BURNETT is instructing LORENTZEN to take the money she is receiving and pay MATTERN, whom BURNETT refers to as "our egg" in this call, and Eli, the unidentified coconspirator.  Additionally, BURNETT twice says they need to get LORENTZEN a new phone not connected to her they can talk on, which is indicative of criminal activity, and LORENTZEN did subsequently obtain a second telephone number, (208) 966-0423, in June 2020.

32.     On June 11, 2020 at approximately 2:13PM, a call was placed from another inmate's account to (509) 866-1433.  AHCC IIU reviewed this call and determined the call was placed by BURNETT and the conversation was with LORENTZEN.  A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

> BURNETT:  I do need to know where we are at.  Do you have any of those players put together for the white team and the black team?  The black team doesn't matter as much as the white team.  I have to have this done by 1-2 tomorrow.
>
> LORENTZEN:  I should have 18 more to put towards the money order.
>
> BURNETT:  I don't know how much we will give him this time, maybe 1-2 depends on what he wants.  I'm going to send you 7-8 this time.  We can move forward and make the next one better.

Based on my knowledge and experience, review of BURNETT's calls, consulting with IIU Investigators Greene and Largent and the timing of this call, I believe BURNETT is referring to methamphetamine, which is a white crystalline substance, when he says "white team" and black tar heroin, which is a black substance, when he refers to the "black team."  I believe LORENTZEN is referring to Suboxone strips when she says "18" and uses the term "money orders."  From context, I submit that "money orders" is the coded language used by BURNETT and LORENTZEN for Suboxone strips.  BURNETT additionally discusses what they might give MATTERN for delivering the controlled substances into AHCC.

33.     On June 12, 2020, at approximately 2:13PM, a call was placed from another inmate's account to (509) 866-1433.  AHCC IIU reviewed this call and determined the call was placed by BURNETT and the conversation was with LORENTZEN.  A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

> BURNETT:  I want you to text Goldy and see what time he wants to meet tomorrow.  I want to leave 9 out for him maybe, give him 9 of the regular ones.  I want the big one for myself.  You're going to have to get some shrink wrap.  You know how I said to put 1, 2, 3, 4, 5, and roll it over and then 5 more on top.  Stack 5 together, you have it make it as small as you can.  Wrap it tight so it doesn't dry out.  Don't stack more than 5 together.  I'm going to send you 8 and I want a couple.  I have to have at least 2 and 2 and in something not see through.
>
> LORENTZEN:  Like last time?
>
> BURNETT:  Yeah.

Based on my knowledge and experience, review of BURNETT's calls, consulting with IIU Investigators Greene and Largent and the timing of this call, I believe BURNETT is instructing LORENTZEN to contact MATTERN to meet and is instructing LORENTZEN regarding how she should package the controlled substances before giving them to MATTERN to take into the facility and deliver them to BURNETT.

34.     On July 8, 2020, AHCC IIU Investigator Greene interviewed CI
AHCC-042070820 (hereafter referred to as "CI-1") in connection with an
unrelated investigation.  CI-1 proffered information that Suboxone is coming from
"a cop in R Unit".  CI-1 stated that s/he did not know who the officer was but that
the inmate who holds the drugs is named "Joe" and the money goes to his girl
named "Brandy" who used a telephone number from the 208 area code, which I
know from my training and experience to be the area code consistent with
Northern Idaho, which is immediately adjacent to the Eastern District of
Washington.  CI-1 stated that s/he did not memorize the full number but had it
written down on a note in her/his cell.  CI-1 added that the number changes but the
current number is the 208 telephone number.  CI-1 explained that the current price
of Suboxone being sold in AHCC is going for $150-$200 for half a strip, $250-
$300 for a full strip, or six full strips for $1,000.  CI-1 admitted that s/he is
addicted to Suboxone and uses it regularly in prison whenever it is available.  A
search of CI-1's cell found a paper with the following writing on it, "Brandy 208-
966-0423 Text."

35.     CI-1 was housed in N Unit at the time of the interview and provided
this information to show that her/his investigation was not the source of Suboxone
coming into the AHCC.  CI-1 was arrested as a juvenile in 1999 for making a false

statement to a public servant. CI-1's criminal history since then has multiple

convictions including theft, burglary, possession of a controlled substance and

assault but no other convictions indicative of deceit. CI-1's information is

consistent with other information independently obtained in the investigation.

*FBI AND AHCC IIU SURVEILLANCE AND RELATED CALLS*

36.     On June 27, 2020, at approximately 2:26PM, a call was placed by

BURNETT from another inmate's account to (208) 966-0423. AHCC IIU

reviewed this call and determined the call was placed by BURNETT and his

conversation was with LORENTZEN. A portion of the call AHCC IIU

Investigators reviewed is transcribed as follows:

> LORENTZEN:  I was going to send him a text to see if he wanted to meet me tonight.
>
> BURNETT:  Did that ever clear?
>
> LORENTZEN:  No
>
> BURNETT:  Okay, I don't know if you've added up what we have so far, I think I might be a couple dollars off. We might have enough to cover it, but I don't want you to cut yourself short.
>
> LORENTZEN: Oh no I have enough to pay him off.
>
> BURNETT:  Okay, okay, what are you going to give him though?
>
> LORENTZEN:  The rest of it.
>
> BURNETT:  Okay, definitely, absolutely, thank you I very much appreciate it. If you could please send him a text I would appreciate it.

Based on my review of call summaries and consulting with AHCC IIU Investigators who reviewed this call and others, I believe that this conversation is about LORENTZEN texting MATTERN so that she can pay him on behalf of BURNETT for delivering controlled substances into AHCC.

37.     On June 27, 2020, FBI and AHCC IIU conducted surveillance on MATTERN's residence, 8524 E. Mission Avenue in Spokane Valley.  I was part of the surveillance team.  At approximately 6:59PM, MATTERN drove his gold Nissan Altima bearing Washington plate BSR5678, from his residence to the parking lot in a shopping center on the southwest corner of Mission and Argonne. A silver PT Cruiser bearing Washington license plate BPZ6009 pulled into the lot and parked near the Nissan.  MATTERN got out of the Nissan and walked over to the PT Cruiser.  No passengers were seen in either vehicle.  At approximately 7:04PM, both vehicles exited the parking lot.

38.     Officers maintained surveillance on the silver PT Cruiser after it met with MATTERN on June 27, 2020.  At approximately 7:20PM the silver PT Cruiser entered the Dollar Tree shopping center on the southeast corner of Sprague and Sullivan.  LORENTZEN exited the silver PT Cruiser and entered the Dollar Tree store.  At approximately 7:54PM, LORENTZEN exited the Dollar Tree store, returned to the silver PT Cruiser, and talked on her cellular telephone.

39. On June 27, 2020, at approximately 7:51PM, a call was placed by BURNETT from another inmate's account to (208) 966-0423. AHCC IIU reviewed this call and determined the call was placed by BURNETT and his conversation was with LORENTZEN. A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

> LORENTZEN: Some lady just got a hold of me and asked how much she is supposed to send.
>
> BURNETT: What was her name and who was it for?
>
> LORENTZEN: Hold on and I'll tell you who it was for, she texted me, her son's name is Henry.
>
> BURNETT: Henry, okay, give me a second
>
> LORENTZEN: Hey hold on she already sent the 100
>
> BURNETT: What else do you have going on?
>
> LORENTZEN: I just came out of the Dollar Store. I had to get some white paint.
>
> BURNETT: Did you get ahold of Goldy?
>
> LORENTZEN: Yeah I just went and seen him
>
> BURNETT: Oh you did?
>
> LORENTZEN: Yeah
>
> BURNETT: What did you give him, the rest?
>
> LORENTZEN: No I gave him 8, because I couldn't take the rest off my card, I can only take 500 a day. I'll come back out tomorrow.

> BURNETT: Perfect. That's badass. That's all he cares about is communication. He just wants to know what's going on. I can respect that. Takes some weight off my shoulders.

Based on my review of call summaries, the surveillance conducted at the time of the call, and consulting with AHCC IIU Investigators who reviewed this call and others, I believe that "Goldy" is MATTERN and that LORENTZEN is confirming in this call with BURNETT that she just met with MATTERN and paid him. The conversation also demonstrates that LORENTZEN is receiving funds from people on behalf of BURNETT for sales of controlled substances inside AHCC.

*CONDUCT LEADING UP TO WEEKEND OF JULY 17-19, 2020*

40.    Based on the context and contents of the calls identified herein, I submit that there is probable cause to believe that BURNETT, LORENTZEN, and MATTERN have been planning a significant delivery into the AHCC as soon as LORENTZEN can obtain the requisite quantity of drugs to give MATTERN to take to the prison in the gold Nissan, and then deliver into the secure portion of the AHCC on his person or in his personal effects, while he is at work.

41.    I know the following from consulting with AHCC staff, including Inspectors Greene and Largent.

a.    MATTERN's work week is from Sunday through Thursday, and he typically has Friday and Saturday off. MATTERN typically begins his shifts at approximately 6:00 a.m.

b.     MATTERN typically wears clothes that have pockets in them, and brings a lunchbox with him when he goes into work.  The various pockets of his typical work attire, as well as his lunchbox, are large enough to contain or secret strips of Suboxone, as well as distribution quantities of heroin and methamphetamine.

c.     MATTERN usually brings his cellular telephone into the AHCC with him on his person and puts it in his locker at AHCC, or he leaves it in the gold Nissan in the parking lot.

d.     MATTERN has the ability to return to the gold Nissan during the work day, such that he could leave drugs in his car in the parking lot when he initially enters the facility in the morning, and could return to his car to get drugs later if that provided what he believed to be the optimal manner of getting the contraband into the facility.

42.     From July 11, 2020, onward, a number of telephone calls indicated that BURNETT, LORENTZEN, and MATTERN were making arrangements to make a significant delivery into the AHCC, likely on the weekend of July 17-19, 2020.

43.     On July 11, 2020, at approximately 7:16PM, a call was placed by BURNETT to (208) 966-0423.  AHCC IIU reviewed this call and determined the

call was placed by BURNETT and his conversation was with LORENTZEN.  A

portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

> BURNETT:  Okay, yeah, there is going to be more today, just want to let you know if you could work really hard, I don't know. How much do you have for that money order?

> LORENTZEN:  Um, I'm not sure.

> BURNETT:  Last time you told me there was like 92, did you ever get more?

> LORENTZEN:  I'm not sure if I did or not.

> BURNETT:  Okay, can you please please work on it and make some calls and get a hold of Scott.

> LORENTZEN:  Yeah, I… today.

> BURNETT:  Okay, cool, cool, I got to have it ready in the next couple days.

> LORENTZEN:  Okay.

> BURNETT:  And uh, also, I am putting together a thousand to give him too. So that hundred, put towards that please, and I am sending you more in the next couple days, so I will send you some for yourself too, alright.

> LORENTZEN:  Oh, for Goldie?

> BURNETT:  Yeah, I want it to go smoothly, you know what I mean, to make him really happy.  'Cause last time you know it was here and there, you know what I mean.

> LORENTZEN:  Yeah, yeah, yeah.

BURNETT: So I want to make him happy so, here in the, you know, I think it will be Thursday or Friday when I have you see him, you know what I mean.

LORENTZEN: Yeah

BURNETT: I want to make it good, so, if you can get a hold of Scott and round that up, and maybe reach out and see if you can find anymore that would be great and we will go from there and work on the other players too if you would.

Based on my review of call summaries and consulting with AHCC IIU Investigators who reviewed this call and others, I believe that BURNETT is referring to Suboxone when he says "money order" and is asking for the quantity of Suboxone strips LORENTZEN has. I believe that BURNETT is stating he wants LORENTZEN to give MATTERN, whom they refer to as "Goldy," $1,000 for taking the drugs from LORENTZEN to BURNETT, using his role as a correctional officer with access to the facility during the COVID pandemic. Additionally, I believe that BURNETT wants the payment to happen in one meet as opposed to multiple meets "to make him [MATTERN] happy"; based on review of prior calls, LORENTZEN met with "Goldy" four times between June 22, 2020, and June 28, 2020, to make payments.

44. On July 13, 2020, at approximately 2:04PM, a call was placed by BURNETT to (208) 966-0423. AHCC IIU reviewed this call and determined the call was placed by BURNETT and his conversation was with LORENTZEN. A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

BURNETT:  Was there a hundred a couple days ago from Greg too?

LORENTZEN:  Yes.

BURNETT:  Okay, cool, will you put that aside, because I got to have that whole one, that whole thousand this time, but uh, I'll send you some more today and tomorrow, and then I will also send a little for yourself. I don't know what your situation is right now, but I hope you are still doing okay.

LORENTZEN: Yes.

BURNETT:  I got you know matter what, will you work on putting that all together?

LORENTZEN: Yeah.

BURNETT:  I would really, really, really like to get the five and five for the team and then three, you know what I mean.

LORENTZEN:  Uh-huh.

BURNETT:  I really really appreciate you, and then the money order, whatever you can do with that would be great. I would like to put you at fifteen this time, because, uh, he did tell me it would be about five weeks, you know the closer we get to 200 dollars the best, for the money order.

Based on my review of call summaries and consulting with AHCC IIU

Investigators who reviewed this call and others, I believe that in this conversation

BURNETT is reinforcing that he wants to pay MATTERN $1,000 for delivering

drugs into the AHCC.  I submit that BURNETT is referring to the controlled

substances methamphetamine and heroine when he says he would "really like to

get five and five for the team," and that he would like to get 200 Suboxone strips when he says "200 dollars . . . for the money order."

45.     On July 15, 2020, at approximately 8:24PM, a call was placed by BURNETT to (208) 966-0423.  AHCC IIU reviewed this call and determined the call was placed by BURNETT and his conversation was with LORENTZEN.  A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

> BURNETT: The players for the team, did you come close to 5, 5, and 5?
>
> LORENTZEN:  Um, I'm not, I don't know, not that much.
>
> BURNETT:  Okay, okay, if you can, the white team, try to come as close to 5 and 5 as you can please.  And I got you, I promise you, you will be very happy with this.
>
> LORENTZEN:  Yeah.
>
> BURNETT:  Okay, did you figure out that money?
>
> LORENTZEN:  Oh, yeah.
>
> BURNETT:  Okay… she sent you five?
>
> LORENTZEN:  Yeah, five.
>
> BURNETT:  Okay perfect, so are we almost there or what do you need?
>
> LORENTZEN:  For what, him?
>
> BURNETT:  For the thousand, yeah.
>
> LORENTZEN:  I don't know.

> BURNETT: Okay, can you figure it out and let me know in the morning and I can take care of whatever else I need?
>
> LORENTZEN: Yeah

Based on my review of call summaries and consulting with AHCC IIU Investigators who reviewed this call and others, I believe that in this conversation BURNETT is referring to methamphetamine when he says "white team" and is asking LORENTZEN if she has $1,000 set aside yet for payment to MATTERN.

46. On July 17, 2020, at approximately 8:36AM, a call was placed by BURNETT to (208) 966-0423. AHCC IIU reviewed this call and determined the call was placed by BURNETT and his conversation was with LORENTZEN. A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

> BURNETT: Hey, I just want to let you know, let me know what exactly you need to make this happen. You got to send him a text today. I think he maybe wanted to meet tomorrow, but he wanted a text today, maybe today, I don't know. So if you can text him around 12, 1 o'clock and what time is your appointment?
>
> LORENTZEN: I don't know, maybe 10.
>
> BURNETT: Okay, what time can I call you back and so you can let me know exactly what you need to make this happen?
>
> LORENTZEN: Um, I don't know. I got drool all over me. What time is it?
>
> BURNETT: It's 8:30.
>
> LORENTZEN: Okay, my appointment is at 10:30 I think.

> BURNETT: Let me know, I can call you back later. Tell me what time and that way you can let me know if you have the money or if you need a little bit, or what do I need to do here to make this happen?
>
> LORENTZEN: I might need a…. man, I am going to have to look on there and see.
>
> BURNETT: Okay, should be close. But if not, I can try to round it up and figure it out, okay.
>
> LORENTZEN: Yeah
>
> BURNETT: What time do you want me to call you back, noon?
>
> LORENTZEN: Yeah, that sounds good.

Based on my review of call summaries and consulting with AHCC IIU Investigators who reviewed this call and others, I believe that in this conversation BURNETT is instructing LORENTZEN to text MATTERN today to determine when she can meet him, and to let BURNETT know if he needs to send her any additional money so LORENTZEN can pay MATTERN.

47. On July 17, 2020, at approximately 12:32pm, a call was placed by BURNETT to (509) 202-9786. AHCC IIU reviewed this call and determined the call was placed by BURNETT. AHCC IIU believes the recipient of the call was Ronnie Thompson ("THOMPSON"), who is currently on DOC community supervision. THOMPSON has eleven prior felony convictions including a conviction associated with controlled substances in 2014. A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

BURNETT:  Hey, I'm trying to get some clarity, you know where I can find any?

THOMPSON:  Fuck, maybe.

BURNETT:  She got the money right now. I fucking need it by tomorrow.

THOMPSON:  How much?

BURNETT:  I need a couple beezies or at least one.

THOMPSON:  I can probably get a ball.

BURNETT:  I'll pay you and within four or five days, I'll send you extra money for it. If you have anything else you want to throw in there, I'll send you a good chunk of money. She got the money right now and if you want to throw in something you got, I'll make it absolutely worth your while. I'm telling you right now, I already sent her ten thousand dollars bro.

THOMPSON:  Damn.

BURNETT:  She got 190 of those she is sending me, at 250 a pop.

THOMPSON:  Did you give her my number?

BURNETT:  No. I'll give you her number real quick and then I will call her and tell her.

THOMPSON:  Okay, what is her number?

BURNETT:  It is 208-966-0423, and just so you know, those go for 250 a piece right now. I don't need none but if you want to throw them in there, I'll send money your way just to help you out. If you can make this happen for me, even some of that dark too, she already got me some, but the more the merrier. I only get to do it once a month.

THOMPSON:  I got some super fire right now.

BURNETT:  Yeah, throw a little bit in there. If she has to, she will buy some from you.

THOMPSON:  Yeah, I'll throw a little chunk in there for ya.

BURNETT:  Yeah, she has close to a beezie for me right now.

THOMPSON:  Of dark?

BURNETT:  Yeah.

THOMPSON:  Oh shit.

BURNETT:  You remember what T Rob used to give us?

THOMPSON:  Yeah.

BURNETT:  I locked it in through that bro.

Based on my training and experience, my review of call summaries, and my consulting with AHCC IIU Investigators who reviewed this call and others, I believe that in this conversation BURNETT is discussing various controlled substances and quantities of controlled substances with THOMPSON when they use the terms "clarity," "beezies," "ball," "little chunk," and "dark."  I believe that BURNETT is offering THOMPSON money for whatever controlled substances he can provide LORENTZEN within that day, and BURNETT stresses that he has the funds to pay by stating, "I already sent her ten thousand bro." I believe BURNETT is stating that LORENTZEN has 190 Suboxone strips when he says "she got 190

of those she is sending me, at 250 a pop," which is consistent with CI reporting that Suboxone strips sell for $250 within the prison.

48.     On July 17, 2020, at approximately 1:22PM, a call was placed by BURNETT to (208) 966-0423.  AHCC IIU reviewed this call and determined the call was placed by BURNETT and his conversation was with LORENTZEN.  A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

> BURNETT:  Will you look and see if that 2 got there?
>
> LORENTZEN:  Hold on.
>
> BURNETT:  Thank you.
>
> LORENTZEN:  Yeah.
>
> BURNETT:  I want to thank you too for saying that about Ronnie, because that means a lot to me that you would fucking realize that and say something.
>
> LORENTZEN:  Yeah, I texted him, he didn't text back too by the way.
>
> BURNETT:  Yeah, he was on his lunch break, he was going to work like literally when I hung up. But I told him I would text or, he would text your number. I'm supposed to call him back at 5 and he said he should have everything taken care of, we will see if he comes through. Did you text Goldy?
>
> LORENTZEN:  Yeah, I texted him too, he hasn't texted me back either.
>
> BURNETT:  Okay, he will. I'm sure. We will get this all put together and I am going to try and send you a little bit more so maybe we can do five and five if it is possible, whatever you can find.

Based on my review of call summaries and consulting with AHCC IIU Investigators who reviewed this call and others, I believe that this conversation confirms BURNETT contacted THOMPSON about providing LORENTZEN additional controlled substances when BURNETT references "Ronnie" and "we will see if he comes through." I believe BURNETT is referring to MATTERN when he says, "Did you text Goldy?" and that they are anticipating having LORENTZEN meet him on Saturday July 18, 2020, to pay him and deliver controlled substances. As with other communications referenced herein, I submit that there is probable cause to believe that LORENTZEN and MATTERN communicate via telephone and/or text messaging.

49.     On July 17, 2020, at approximately 5:51PM, a call was placed by BURNETT to (208) 966-0423. AHCC IIU reviewed this call and determined the call was placed by BURNETT and his conversation was with LORENTZEN. A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

> BURNETT: Hey, did you get that 250?
>
> LORENTZEN: Um, hold on while I check. Where was it coming from?
>
> BURNETT: Uh, she should have texted you a little while ago.
>
> LORENTZEN: Hold on.
>
> LORENTZEN: Hello
>
> BURNETT: Yeah

LORENTZEN:  There was only two and that was sent at like 12:30.

BURNETT:  Uh, okay, I think she was doing around 2:30 – 3:00, I'll have him call and check.

LORENTZEN:  Ok, um, Adam said he's in the same unit, same side, what do you want him to do?

BURNETT:  Uh, whatever.

LORENTZEN:  I think he'll call back at 7:45

BURNETT:  Um, okay, how much more do you need to make all that happen?  Obviously you got what you need. I want to make sure you got what you need.

LORENTZEN:  I just want to get some more for you.  Go get some more players for the team.

BURNETT:  Definitely, that's what I need. So I know the 250 is coming for sure. If you need more ask them to send another 100 or 125.

LORENTZEN:  Okay.

BURNETT:  Will you try to round all that up tonight? Did he ever text you back?

LORENTZEN:  Um, yeah, Goldy did. We are going to meet tomorrow night.

BURNETT:  Perfect, perfect, okay, so that gives us until tomorrow night. I'll ask him, I'll have him call his old lady and have it sent. It was already sent, so I don't know if she just hasn't text yet or what.

LORENTZEN:  Okay.

BURNETT:  I'll mention it to him right and have him send a message.

LORENTZEN:  Okay.

BURNETT:  I'll call you back as soon as I know, alright.

LORENTZEN:  Okay.

BURNETT:  Hey, did you ever hear back from Ronnie because I was going to call him again.

LORENTZEN:  No, I didn't.  Let me see where's my phone at, my other phone.

BURNETT:  I gave him the 208 number.

LORENTZEN:  Oh yeah, he hasn't called, he hasn't. I texted him from the other number.

BURNETT:  You didn't miss a call or text or anything from earlier? That might have been her sending the 250.

LORENTZEN:  Hold on. No, the only one who has called this number is Adam and you.

BURNETT:  Okay, I'll check on it and give you a call back as soon as I figure it out.

Based on my review of call summaries and consulting with AHCC IIU

Investigators who reviewed this call and others, I believe that when LORENTZEN

says, "get some more for you, go get some more players for the team," she is

telling BURNETT that she is trying to obtain additional controlled substances for

him.  In this conversation, LORENTZEN confirms she received a text message

from "Goldy," who I believe to be MATTERN, and that they anticipated meeting

the next night, Saturday July 18, 2020.  I believe BURNETT asks about

"RONNIE" who I believe to be THOMPSON, so that LORENTZEN could possibly obtain additional controlled substances from him.

50.     On July 18, 2020, at approximately 10:12 AM, a call was placed by BURNETT to (208) 966-0423.  AHCC IIU reviewed this call and determined the call was placed by BURNETT and his conversation was with LORENTZEN.  A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

> BURNETT: What up... What you doing?
>
> LORENTZEN: Nothing...
>
> BURNETT: What you doing up
>
> LORENTZEN: I've been up, I have to get up early on Saturday
>
> BURNETT: You doing alright?  How did things work out?
>
> LORENTZEN: I already got the money out so...
>
> BURNETT: Cool, cool, cool, did you come across anymore of that?
>
> LORENTZEN: Yeah, I did
>
> BURNETT: Okay, what are we looking like?
>
> LORENTZEN: I'm not sure, but at least... I wrote it down somewhere... um... at least 5 and 2, I didn't get any more of the black ones... just the original two that I had.
>
> BURNETT: You mean 5 and 5 or just 5 altogether?
>
> LORENTZEN: 5 altogether, 5 of the white players.
>
> BURNETT: okay did you get that 250 last night

LORENTZEN: hold on let me look… yeah

BURNETT: okay cool, can you check around and see if you can find anymore?

LORENTZEN: Yes

BURNETT: Okay I would really, really like to make it 5 and 5 or 4 and 4 or 3 and 3, you know?

LORENTZEN: What do you mean by that though?

BURNETT: Like the white ones, just... you know how you split it last time... you did 3 and 3... you have to do the same thing this time split it, and split both of them, the white players and the black players in one blue glove, you know what I mean, exactly like you did last time.

LORENTZEN: okay

BURNETT: Then the other things, you got to wrap them up exactly as you did last time, 5 and packs of 20.

LORENTZEN: okay

BURNETT: but make sure you wrap them up really, really good and then double wrap them and the end… so they stay fresh.

LORENTZEN: yeah i will

BURNETT: okay then you are going to leave 10 out for him and put them in a separate envelope with the thousand.

LORENTZEN: okay

BURNETT: you're a badass, Ronnie never got a hold of you.

LORENTZEN: nope

BURNETT: That is disappointing that really fucking bothers me big time..., that really upsets me, god damn him... you got that 250 can you check and see if you can round up a few more?

LORENTZEN: Yeah I will

BURNETT: the white and black players if you can it would be badass, if we can't it's okay... just do it exactly as you did last time, make them as small as possible and then split it in half.

LORENTZEN: okay

BURNETT: Thank you very much beautiful, I will call you back in a little bit. I think I am sending you a little more ducats in a little bit, I will call you back and let you know... I call you back in an hour, two hours at max.

LORENTZEN: okay.

Based on my training and experience, my review of call summaries, the investigation, and my consulting with AHCC IIU Investigators who reviewed this call and others, I believe that this conversation consists of LORENTZEN and BURNETT finalizing the details, quantities, and prices for the significant delivery that LORENTZEN anticipates making to MATTERN on the weekend of July 17-19, 2020, for MATTERN to deliver into AHCC. Among other things, BURNETT and LORENTZEN appear to be confirming that LORENTZEN will be giving MATTERN at least five grams of methamphetamine ("the white players") for further distribution into the AHCC.

51.     On July 18, 2020, at approximately 12:07 PM, a call was placed by BURNETT to (509) 768-9879. AHCC IIU reviewed this call and determined the

call was placed by BURNETT and his conversation was with a person named Eli.

A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

> BURNETT: Eli

> ELI: What's up dog...

> BURNETT: I need some... clear, you got any.

> ELI: I only got half of what I was supposed to get last time...

> BURNETT: She just put 2500 into what I need, that is kinda my fault

> ELI: Okay, I'll go get you some right now then man, will she have a little change for the other...

> BURNETT: I can probably get you a hundred or hundred and a half... I need it like right now, because she is dropping it off in a minute like two hours.

> ELI: Yeah, listen, all I got to do is go to my house...

> BURNETT: How much do you want for five, you got that much?

> ELI: strips?

> BURNETT: no the clear...

> ELI: five what?

> BURNETT: 5 Gs

> ELI: I don't know, 150 bucks or something…

> BURNETT: she has the money right now, she has two fifty right now... will you call her for sure.

> ELI: I'm almost to Spokane... I'll be there in 45 minutes.

BURNETT: you got my word, within 5 days, I will have you good money because I will have it within in five days... for everything I got you... she has 200 of those other things for me.

ELI: I'll be to her house in like 45 minutes…

Based on my training and experience, my review of call summaries, the investigation, and my consulting with AHCC IIU Investigators who reviewed this call and others, I believe that this conversation consists of BURNETT making arrangements for additional details, quantities, and prices for the significant delivery that LORENTZEN anticipated making to MATTERN on Saturday, July 18, 2020, for MATTERN to deliver into AHCC. BURNETT specifically indicates that LORENTZEN is going to be "dropping it off" in approximately two hours, which I believe was an indication that LORENTZEN anticipated meeting with MATTERN to deliver drugs to him later in the day on July 18, 2020.

52. On July 18, 2020, at approximately 2:37 PM, a call was placed by BURNETT to (208) 966-0423. AHCC IIU reviewed this call and determined the call was placed by BURNETT and his conversation was with LORENTZEN. A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

BURNETT: Can you check and see if there is a 2?

LORENTZEN: Ya who would it be from?

BURNETT: Fuck, I don't know the name should've been 20 minutes ago.

LORENTZEN: Adam sent 175

BURNETT: If he calls back tell him I'll meet him at 8:30 in the morning.

LORENTZEN: K

BURNETT: Did you get everything sorted out with Eli?

LORENTZEN: Ya, I have to go get some money.

BURNETT: I know you're good, but I wanted to remind you it will take a while to wrap all that up.

LORENTZEN: Ya I know

BURNETT: Then it goes 10 for him and a rack in the envelope and whatever it is split make sure it is a non-see through okay.

LORENTZEN: Ya I know

BURNETT: I'll call you back in a little while.

Based on my training and experience, my review of call summaries, the investigation, and my consulting with AHCC IIU Investigators who reviewed this call and others, I believe that this conversation consists of LORENTZEN and BURNETT finalizing additional details, quantities, and prices for the significant delivery that LORENTZEN anticipated making to MATTERN during the weekend of July 17-19, 2020, for MATTERN to deliver into AHCC. Specifically, I believe that "rack" refers to $1000 in an envelope and that the "10" to MATTERN is a reference to Suboxone for MATTERN's personal use.

*SURVEILLANCE CONDUCTED ON JULY 18, 2020*

53.     On July 18, 2020, FBI and AHCC IIU conducted surveillance, including on MATTERN's residence, 8524 E. Mission Avenue in Spokane Valley, and the gold Nissan Altima. I was part of the surveillance team. We surveilled MATTERN running some errands in the gold Nissan, but we did not see him meeting with LORENTZEN consistent with the calls from BURNETT. However, a recorded jail call from BURNETT to LORENTZEN on Sunday, July 19, 2020, indicated that LORENTZEN would be reaching out to MATTERN in the afternoon of Sunday, July 19, 2020, around the time MATTERN got off his shift.

*RELEVANT JAIL CALL ON JULY 19, 2020*

54.     On July 19, 2020, my colleagues at AHCC informed me that they had listened to a recorded jail call from AHCC that day in which BURNETT called LORENTZEN and asked her if she was going to make contact with MATTERN on July 19, 2020. LORENTZEN responded briefly that she was.

*SURVEILLANCE ON JULY 19, 2020*

55.     On July 19, 2020, FBI and AHCC IIU conducted surveillance, including on MATTERN's residence, 8524 E. Mission Avenue in Spokane Valley, and the gold Nissan Altima. I was part of the surveillance team. My colleagues and I surveilled MATTERN drive the gold Nissan Altima to the parking lot of a Rite-Aid store on Mission and Argonne in Spokane Valley. At a little after 7:00

PM, I saw MATTERN park in the lot and appear to wait. A few minutes later, I saw a PT Cruiser consistent with LORENTZEN's vehicle arrive at the parking lot and park immediately adjacent to MATTERN, who was in the gold Nissan, with their drivers' side doors facing. Neither driver got out of their vehicles.

56. I know from my AHCC colleague, Inspector Greene, who was surveilling LORENTZEN, that she was seen leaving her home at a time consistent with the amount of time it would take to travel to the meet location at Argonne and Mission. I believe that the driver of LORENTZEN's PT Cruiser was in fact LORENTZEN; I did not observe any passengers in either car.

57. I saw the vehicles driven by LORENTZEN and MATTERN meet in the empty part of the parking lot where there were no other cars. Other agents who were surveilling the parking lot took pictures of what happened next, and reported the information to me. I learned from my colleagues, and from reviewing the photographs that they took, the following. After LORENTZEN parked next to MATTERN, she handed him, through the window of her vehicle, a large white envelope. MATTERN accepted the envelope. After perhaps a minute or two, MATTERN and LORENTZEN each departed. I saw MATTERN drive away from the parking lot in the direction of his house; FBI terminated surveillance on MATTERN. I saw LORENTZEN leave the parking lot and drive away in a different direction.

58.     I know from my training and experience that this conduct – two people, alone, driving to meet in a parking lot away from others, in the evening, for only a short period of time, in which neither of them got out of their vehicles and one of them handed an object to the other – is consistent with one person delivering drugs and/or money to the other.

59.     Based on the jail calls to which I have listened, along with the surveillance my colleagues and I have conducted, I submit that there is probable cause to believe that after 7:00 PM on Sunday, July 19, 2020, LORENTZEN made a delivery of drugs and/or money to MATTERN in a large white envelope, at a parking lot at Argonne and Mission in Spokane Valley, for MATTERN to further deliver into the AHCC consistent with the planning set forth by BURNETT in recorded jail calls.

60.     After I watched LORENTZEN and MATTERN meet, I received confirmation via telephone from my colleagues at AHCC that they had listened to a recorded telephone call from BURNETT to LORENTZEN in which LORENTZEN confirmed that she had met with "Goldy," whom I know to be MATTERN.

61.     I believe that MATTERN has previously facilitated the distribution of methamphetamine into the AHCC.  On May 6, 2020, at approximately 6:03 PM, a call was placed by BURNETT from another inmate's account to (509) 866-1433.

AHCC IIU reviewed this call and determined the call was placed by BURNETT and the conversation was with LORENTZEN. A portion of the call AHCC IIU Investigators reviewed is transcribed as follows:

> BURNETT: This is what I am trying to do, you sent one of those last time. You sent me less than one with like a half on it.

> LORENTZEN: Oh, you are talking about your birthday card?

> BURNETT: Yeah, if you can get two of those and put 4 or 5 on each one and just soak the whole thing, you think it is a possibility?

> LORENTZEN: It is hard to get one of those birthday cards right now. I've been trying for a few days.

> BURNETT: Even if the one you have, if you can drench it, it doesn't matter, you know what I mean.

> LORENTZEN: The thing is, I'm trying to find the stuff for the birthday card, the glitter, but it is hard to find.

> BURNETT: Mike says he has some for me… can you get it if I send you the money?

> LORENTZEN: That is the thing, it is hard to locate.

> BURNETT: I have a bunch of money right now. Basically right now in the next day or two, I was trying to get him that 100 bucks and a couple cards. But I want to round up at least 30 or 40 of those so I can send you a couple grand. I don't care what it looks like, I just want enough put on it to make it worth it for us. I have to give him a bill too, the one I haven't seen you, the one who needs it.

> LORENTZEN: Are you talking about the gold car?

> BURNETT: Uh, the 100 dollars.

> LORENTZEN: Yeah, does that go to the gold car?

BURNETT:  Yeah

LORENTZEN:  Okay.

BURNETT:  If you can get him that hundred bucks… basically my whole goal is to wait on the other one, because it will be more worth it. I know you said you have that one 10 dollar money order, but I would like to get 3 or 4 more 10 dollar money orders, you know what I mean?

LORENTZEN:  Yeah, hold on, I am going to find out what he wrote down. I was partially right on the size of them. He says he has two of the big size and 16 of the half size ones.

BURNETT:  Yeah, I want them all.

LORENTZEN:  It will be me paying for him… I'll buy them tonight.

BURNETT:  I want to push the envelope this time and go for as many as we can get. The birthday card you sent me, I want you to put 4 or 5 times that on it. Would you mind sending him a text and telling him we'll have it ready for him tomorrow or the next day?

LORENTZEN:  Who, gold car?

BURNETT:  Yeah, yeah, yeah.

LORENTZEN:  Okay, so I have to have the money and the birthday card for him.

Based on my review of call summaries and consulting with AHCC IIU

Investigators who reviewed this call and others, I believe when BURNETT and

LORENTZEN refer to a "birthday card" they are referring to methamphetamine

paper.  I know from my training and experience that it is a common technique for

inmates to have associates soak greeting cards in methamphetamine and then send

the cards into the correctional facilities as a means to get methamphetamine inside facilities. Additionally, I believe this because I know that BURNETT's actual birthday is not until August 7, approximately three months from the date of this call, and BURNETT specifically instructs LORENTZEN to "soak" and "drench" the card. I know that LORENTZEN would need a secure, safe location to engage in the conduct of drenching a greeting card in methamphetamine, such as her home, before delivering it to "gold car," who I believe is MATTERN.

*ARREST OF MATTERN AND SEIZURE OF METHAMPHETAMINE*

62.     On July 20, 2020, law enforcement officers arrested MATTERN within the AHCC after he was in the secure part of the facility. During a lawful search of MATTERN and his person, law enforcement recovered his lunchbox. Inside his lunchbox was a tobacco tin. Inside the tobacco tin were two blue rubber gloves. Inside each of the rubber gloves were small ziplock baggies. Inside the ziplock baggies was a white crystalline substance that I recognized from my training and experience to be consistent with methamphetamine.

63.     The use of a blue rubber glove as packaging was consistent with BURNETT's prior conversations with LORENTZEN about packaging drugs for delivery into the AHCC. I know from jail calls that LORENTZEN had to spend time packaging the drugs prior to meeting with MATTERN.

64.    I used a standard field-testing kit to test the white crystalline substance, and the results were presumptively positive for methamphetamine.

65.    I removed the crystalline substance from the blue rubber gloves, and weighed it in the ziplock baggies.  The quantity of suspected methamphetamine that I weighed in the ziplock baggies was approximately seven grams from inside one of the blue rubber gloves, and approximately eight grams from inside the other blue rubber glove, yielding a total of approximately fifteen grams of suspected methamphetamine.  Based on my training and experience, and common sense, I know that the weight of the ziplock baggies I weighed was far less than ten total grams.  Accordingly, I submit that there is probable cause to believe that the total quantity of suspected methamphetamine possessed by MATTERN, exclusive of packaging, was more than five grams.  This quantity of presumptively-positive methamphetamine was consistent with the quantities that BURNETT discussed with LORENTZEN on jail calls regarding what LORENTZEN was going to give MATTERN to distribute to BURNETT.

66.    From my training and experience and consulting with other law enforcement agents, I know that methamphetamine in this district in recent months is rarely lower than 96% pure, such that there is probable cause to believe that the net weight and purity of the substance I weighed, exclusive of packaging materials, exceeds five grams of pure methamphetamine.

67.     I know that MATTERN received an envelope from LORENTZEN on the evening of July 19, 2020, in a parking lot in the Spokane Valley.  When law enforcement recovered the rubber gloves containing the suspected methamphetamine from MATTERN's lunchbox, they were in a tobacco tin and were no longer in a white envelope.  Accordingly, I submit that at some point, MATTERN likely had to take the blue rubber gloves containing methamphetamine out of the white envelope and put it into the tobacco tin that he then put into his lunchbox.  Law enforcement also recovered suspected Suboxone and suspected heroin, wrapped separately from the suspected methamphetamine.  In light of the fact that MATTERN likely had to handle the blue gloves to get them into his lunchbox, and the fact that the methamphetamine was wrapped separately from the suspected Suboxone and heroin, I submit that there is additional indicia that probable cause exists to believe that MATTERN knowingly possessed the suspected methamphetamine in the blue rubber gloves.

68.     I know from my training and experience that approximately fifteen grams of methamphetamine, even with packaging, is a distribution, rather than personal use, quantity

69.     In addition, during an interview of MATTERN at AHCC in which I participated on July 20, 2020, MATTERN acknowledged that he received $1000 in an envelope on the evening of July 19, 2020, from the person I know to be

LORENTZEN.  That exchange of money is consistent with the jail calls of which I have knowledge.

70.    In light of what I know about the extensive planning, recorded jail calls, surveillance, and review of the suspected methamphetamine set forth herein, I respectfully submit that there is probable cause to believe that MATTERN knowingly possessed five grams or more of pure methamphetamine with intent to distribute, within the Eastern District of Washington.

## CONCLUSION

71.    Based on the forgoing, I submit that I submit that probable cause exists for the issuance of a Criminal Complaint and Arrest Warrant for MATTERN for possession of five grams or more of pure methamphetamine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), within the Eastern District of Washington.

///

///

///

///

///

///

///